UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Central Division)

| | |
|---|---|
| In re: | Chapter 11 Case |
| REMEDIUM PHARMACY, LLC, | Case No.: 26-40803 (EDK) |
| Debtor. | |

**DEBTOR'S OBJECTION TO UNITED STATES TRUSTEE'S
MOTION TO APPOINT A CHAPTER 11 TRUSTEE**

The above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its proposed counsel, objects to the United States Trustee's ("UST") Motion to Appoint a Chapter 11 Trustee [Docket No. 47] (the "Motion"). In support, the Debtor states as follows:

**PRELIMINARY STATEMENT**

1.      The appointment of a Chapter 11 trustee is an extraordinary remedy. There is a strong presumption that a debtor-in-possession should remain in control of its affairs. The United States Trustee (the "UST") has not carried—and cannot carry—its heavy burden of proving by clear and convincing evidence that "cause" exists under 11 U.S.C. § 1104(a)(1) or that appointment is in the interests of creditors under § 1104(a)(2).

2.      The Motion rests on three incomplete and inaccurate premises: (1) that pre-petition advances recorded as "loans to shareholders" constitute fraud, dishonesty, incompetence or gross mismanagement; (2) that the Debtor's books and records are so deficient that professionals cannot rely on them; and (3) that Mr. Flaviu Iepure is hopelessly conflicted because he will never pursue recovery of those advances. None of those premises survives scrutiny on this record.

3.      The Debtor has already commenced an adversary proceeding to determine the validity, priority, and extent of the MCA claims and liens. The Debtor has retained CBIZ Forensic Consulting Group, LLC ("CBIZ") as financial advisors who are reconstructing the Debtor's books

and records and should provide this Court comfort regarding the operational management post-petition. Pharmacies depend on licenses, patient relationships, long-term care ("LTC") contracts and regulatory compliance that evaporate in a forced liquidation. The Motion, if granted, would convert a viable reorganization at this critical early stage of the case into precisely the Chapter 7 liquidation the U.S. Trustee Program is charged with preventing. Furthermore, the Debtor has retained (subject to this Court's approval) Getzler Henrich & Associates LLC to designate Mark Podgainy as Chief Restructuring Officer (the "CRO"), effective *nunc pro tunc* to the petition date, and to provide related financial advisory and management consulting services, thereby eliminating any perceived conflict. A trustee would only impose an unnecessary additional layer of administrative expense on the estate. Finally, the issue of repayment of loans to insiders will be resolved in the context of the Debtor's plan of reorganization as a condition to confirmation which parties—an issue to which the UST and other parties may object if not satisfied with the proposed treatment.

4.      The UST's statement that "the Debtor has not responded" to informal document requests is inaccurate. In fact, counsel for the Debtor and the UST conferred by Teams on July 22, 2026—the very day the Motion was filed—and the Debtor's professionals have been in continuous contact with the Office of the United States Trustee since the Petition Date. The United States Trustee's proper statutory role is to monitor compliance and protect the integrity of the process, not to force a premature liquidation that destroys value for every stakeholder.

### BACKGROUND

5.      The Debtor filed its voluntary Chapter 11 petition on July 6, 2026. It continues to operate as debtor-in-possession under §§ 1107(a) and 1108. No official committee has yet been formed despite the UST's solicitation.

2

6. The Debtor is an independent Massachusetts pharmacy providing retail and LTC services. Its value lies in its licenses, patient relationships, LTC contracts and going-concern operations—assets that are notoriously difficult to monetize in a forced liquidation.

7. Pre-petition liquidity pressure arose from a cascade of high-cost merchant cash advances. As the Debtor's principal has clarified, a material portion of the advances recorded on the books as "loans to shareholders" were in fact used to service those MCA obligations. The precise characterization and amount of any net receivable remain subject to the ongoing forensic work of the Debtor's financial advisor and will be addressed in the ordinary course through the claims process, the pending adversary proceeding, or a plan of reorganization.

8. On July 15, 2026, the Debtor commenced Adversary Proceeding No. 26-04026 seeking, among other relief, a determination of the validity, priority, and extent of the MCA liens and claims. That litigation is the proper vehicle for resolving any claim allowance, avoidable-transfer, or recharacterization issues.

9. The Debtor's professionals have already begun the process of bringing the books and records current. The Court granted an extension of the deadline to file schedules and the statement of financial affairs precisely so that work could be completed reliably.

10. At the July 22, 2026, conference with the UST and counsel to AmerisourceBergen required by Local Rule 9013-1(f), Debtor's counsel proposed the appointment of a chief restructuring officer as a tailored alternative that would eliminate any perceived conflict while preserving operational continuity. For unclear reasons, the UST rejected that proposal.

## ARGUMENT

**I.     Appointment of a Chapter 11 Trustee Is an Extraordinary Remedy That Requires Clear and Convincing Evidence**

11.     "The appointment of a chapter 11 trustee is considered to be an 'extraordinary' act since, in the usual case, the debtor remains a debtor-in-possession throughout the reorganization." *Petit v. New Eng. Mortg. Servs., Inc.*, 182 B.R. 64, 68 (D. Me. 1995) (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990)). The strong presumption is that current management remains in control. *In re G-I Holdings, Inc.*, 295 B.R. 502, 508 (D.N.J. 2003), *aff'd*, 385 F.3d 313 (3d Cir. 2004).

12.     The majority of courts—including the Bankruptcy Court for the District of Puerto Rico in *In re Muñoz*—require the moving party to prove the need for appointment by clear and convincing evidence. *In re Muñoz*, 544 B.R. 266, 275 (Bankr. D.P.R. 2016), *aff'd*, 553 B.R. 179 (B.A.P. 1st Cir. 2016), *aff'd*, 866 F.3d 487 (1st Cir. 2017) (explicitly applying clear-and-convincing standard); *see also In re Thomas*, 596 B.R. 350, 360 n.7 (Bankr. W.D. Tenn. 2019) (disagreeing with *Tradex*).[1] The First Circuit has not yet resolved the standard, but left the issue open in *López-Muñoz* while affirming denial of appointment under either standard. 866 F.3d at 497 n.5. The extraordinary nature of the remedy and the strong presumption in favor of the debtor-in-possession compel application of the clear-and-convincing standard in this Circuit.

13.     The UST has not met that burden.

---

[1] *Tradex Corp. v. Morse*, 339 B.R. 823 (D. Mass. 2006), applied a preponderance standard and affirmed appointment on a record that included a grand-jury investigation, the principal's invocation of the Fifth Amendment, repeated inaccurate schedules, and inter-company transactions that the bankruptcy court found highly irregular. Those facts are absent here. Moreover, *Tradex's* adoption of a preponderance standard is a minority view that conflicts with the clear-and-convincing requirement applied by the majority of courts, including the bankruptcy court whose decision was affirmed by the First Circuit in *López-Muñoz* and the court in *In re Thomas*. *Tradex* does not compel appointment on this far weaker record.

## II.      No "Cause" Exists Under § 1104(a)(1)

14.      The Motion's central allegation—that the pre-petition advances constitute fraud, dishonesty, incompetence or gross mismanagement—collapses under the actual facts and controlling First Circuit authority. To the contrary, the approximately $3.57 million in net pre-petition transfers identified by the United States Trustee were potentially directed into three categories: (i)  transfers to an affiliated corporation; (ii) payments to Flaviu Iepure and Cristina Iepure in lieu of accrued salary; and (iii) transfers made to avoid MCA direct collection activity that were thereafter used to pay the MCA's on a controlled basis, and to acquire inventory. These transfers are currently being analyzed by CBIZ and will be further disclosed to the Court. Annexed hereto as **<u>Exhibit "1"</u>** is a chart summarizing the alleged pre-petition transactions in which the Debtor is alleged to have transferred funds.

A.   *<u>López-Muñoz Controls and Requires Denial</u>*

15.      In *United Surety & Indemnity Co. v. López-Muñoz (In re López-Muñoz)*, 866 F.3d 487 (1st Cir. 2017), the First Circuit affirmed the denial of a motion to appoint a trustee that rested on virtually identical theories: alleged fraudulent pre-petition transfers to an insider entity, incomplete or inaccurate schedules, and a claimed conflict of interest that would prevent the debtor from pursuing a turnover claim. *Id.* at 496, 500–01. The bankruptcy court found, and the First Circuit affirmed, that:

- the debtor's explanations were credible;
- any errors or omissions were unintentional;
- the transfers caused no material harm to the estate; and
- no viable turnover claim existed once the facts were fully developed.

5

*Id.* at 493–502. The court emphasized that the inquiry under § 1104(a)(1) is fact-intensive and turns on the totality of the circumstances, not isolated badges of fraud. *Id.* at 497–98.[2]

16. The same analysis applies here. The advances are recorded as assets of the estate. Any net receivable can be pursued, compromised, or contributed as part of a plan of reorganization which will be subject to creditor scrutiny and/or rights of objection. The Debtor has already retained experienced professionals to reconstruct the books and has commenced the adversary proceeding that will liquidate any claim allowance or avoidable-transfer issues regarding the MCAs. There is no evidence of intent to hinder, delay or defraud creditors—only the ordinary, if imperfect, attempts of a small business to stay afloat amid a difficult insurance reimbursement environment and severe MCA-driven cash-flow interruptions. Under *López-Muñoz*, these facts do not constitute "cause."

B. *The Remaining Cases Cited by the UST Are Inapposite*

17. *In re Bellevue Place Associates*, 171 B.R. 615 (Bankr. N.D. Ill. 1994), is not First Circuit authority. More importantly, the "cause" found there was a management agreement that contractually stripped the debtor-in-possession of the ability to discharge its fiduciary duties. No such agreement exists here. *Id.* at 619, 623. The Debtor's proposed financial advisors eliminate

---

[2] "Some mismanagement exists in every insolvency case." *In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988); *see also In re Sundale, Ltd.*, 400 B.R. 890, 907 (Bankr. S.D. Fla. 2009) ("Gross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization . . . . But it must rise above simple mismanagement to achieve the level envisioned by the Code.") (citing *Mako*); *In re Samy*, 673 B.R. 573, 591 (Bankr. D. Kan. 2025) ("In other words, the alleged "cause" must be something significant."). Regarding appointment under § 1104(a)(1), courts note that some additional type of misrepresentation or breach of duty is required:

> cases usually involve some blatant attempt by the debtor to deceive the creditors to the profit of the debtor and the detriment of the creditors. Gross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization. But it must rise above simple mismanagement to achieve the level envisioned by the Code.

*Id.*; *In re Cardinal Indus., Inc.*, 109 B.R. 755, 765 (Bankr. S.D. Ohio 1990) ("Certainly some of the Debtors' prepetition actions were highly questionable and there were numerous examples of mismanagement by inadequate control over administrative and financial systems. However, the evidence of incompetence or gross mismanagement is not sufficient to support the appointment of a trustee premised upon those grounds alone.").

any potential conflict without the drastic remedy of a trustee. Furthermore, the Debtor has already proposed the appointment of a CRO—expressly offered at the July 22 conference with the United States Trustee—which would similarly eliminate any potential or perceived conflict. *Bellevue* is therefore distinguishable on its facts and its circuit.

18.     *In re DN Associates*, 144 B.R. 195 (Bankr. D. Me. 1992), *aff'd*, 3 F.3d 512 (1st Cir. 1993), concerned a post-confirmation fee application. The court held that the debtor's professionals remained disinterested and that their services conferred a benefit on the estate. *Id.* at 201. It has nothing to do with first-day motions or the appointment of a trustee. Citation of *DN Associates* is simply inapposite.

19.     *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 285 B.R. 148 (Bankr. D. Del. 2002), is, if anything, helpful to the Debtor. The court declined to appoint a trustee even though "cause" arguably existed, because appointment is a remedy of last resort and other avenues of relief (including derivative standing for the committee) remained available. *Id.* at 158, 160–61. Here, the Debtor has already hired financial accountants with significant Chapter 11 experience and reputation in this Circuit, commenced the MCA adversary proceeding, proposed a CRO and is formulating a plan of reorganization. *W.R. Grace* teaches that the Court should exhaust less drastic alternatives first—precisely what the Debtor has already done and further proposed at the July 22 conference.

20.     *Bezanson v. Thomas (In re R & R Assocs. of Hampton)*, 402 F.3d 257 (1st Cir. 2005), addresses the liability of former Chapter 11 counsel for conflicts after conversion to Chapter 7. *Id.* at 265. This case also has no bearing on whether a trustee should be appointed in an ongoing Chapter 11 case.

**III.** **The Debtor's Funding of RXFlow Robotics, LLC Reflects Ordinary and Prudent Small-Business Expansion and Does Not Constitute Cause for Appointment of a Trustee**

21. Approximately $600,000 of the expenditures identified by the UST—representing capital deployed over roughly two and a half years—was used by the Debtor to form and capitalize RXFlow Robotics, LLC ("RX Flow"), a complimentary entity established to support and enhance the Debtor's core operations. This more recent investment builds upon earlier capital contributions of approximately $600,000 or more made to RX Flow between 2020 and 2023, reflecting a consistent, multi-year strategy of measured investment in synergistic technology and automation capabilities.

22. RX Flow was created to function synergistically with the Debtor by automating selected operational processes and facilitating the Debtor's continued growth and efficiency. In connection with any plan of reorganization, Flaviu intends to pledge his interests in RX Flow to support a plan with creditors, thereby ensuring that the value created through these investments remains available for the benefit of the estate and its creditors.

23. It is both commonplace and commercially reasonable for the operators of a small business to pursue measured expansion and diversification through related entities in order to adapt to market demands and strengthen its competitive position. The Debtor's sustained support of RX Flow across multiple years exemplifies precisely this type of ordinary-course business judgment.

24. Such ordinary-course investment and operational integration—whether the more recent approximately $600,000 or the earlier capital contributions—does not constitute mismanagement, self-dealing, or any other impropriety. It therefore provides no basis for the extraordinary relief of appointing a Chapter 11 trustee under 11 U.S.C. § 1104.

**IV.     Appointment of a Trustee Would Collapse Essential Financing and Supply Arrangements and Force Liquidation**

25.     The Debtor has already arranged for: a) continued shipment by AmerisourceBergen, on a prepaid basis; and b) inventory financing by Alleon under 11 U.S.C. § 364.

26.     Upon information and belief, both will collapse if a Chapter 11 trustee is appointed.

27.     Without post-petition credit and supply arrangements, it is virtually inevitable that the Debtor will be forced out of business.

28.     This would leave only speculative estate causes of action in a case heavily burdened with secured and priority claims.

**V.     The Estate Causes of Action Against the Principals Are Speculative**

29.     The causes of action asserted by the United States Trustee on behalf of the estate against the principals are speculative and uncertain both as to liability and as to collectability.

30.     Neither the creditors nor this Court should be required to speculate concerning the value of such uncertain causes of action. *See, e.g.*, *Steiner v. eBay, Inc.*, 795 F. Supp. 3d 144, 167 (D. Mass. 2025) ("Damages must also be established 'to a reasonable degree of certainty, even if not with mathematical precision . . . In other words, a plaintiff cannot recover when such damages are 'remote, speculative, hypothetical, and not within the realm of reasonable certainty.'") (internal citations omitted).

31.     The creditors should not be compelled to forgo the future profits and going-concern value of a viable business in exchange for uncertain, remote, and speculative causes of action.

32.     Significantly, the UST has made no showing of any itemization or calculation of the recoverability or potential recovery from these purported causes of action.

## VI.    Appointment is Not in the Interests of Creditors Under § 1104(a)(2)

33.    Section 1104(a)(2) requires a balancing of costs and benefits. 11 U.S.C. § 1104. Appointment of a trustee would impose substantial additional expense on a small estate, disrupt the delicate regulatory and contractual relationships that constitute the Debtor's going-concern value, and almost certainly force a liquidation of a specialized pharmacy business that is extraordinarily difficult to sell. Patients, LTC facilities, and the estate itself would suffer immediate and irreparable harm.

34.    The Debtor's proposed engagement of CRO, combined with CBIZ as the Debtor's financial advisors—eliminates any perceived or potential conflict, preserves operational continuity, and keeps the fiduciary duties of the estate intact at far lower cost and risk of liquidation. That is the proportionate response contemplated by the case law and by the UST's own statutory mission to protect the integrity of the process rather than to destroy value.

35.    The Court should note that "[t]he philosophy of chapter 11 is to give the debtor a 'second chance' and, consistent with such philosophy, current management should be permitted to identify and correct its past mistakes". *In re Gen. Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984). Appointment of a trustee on motion made sixteen days into this Chapter 11 case, where the Debtor has been proactive, would not be consonant with that policy.

## VII.    The Adversary Proceeding Was Commenced to Facilitate Plan Formulation, and No Immediate Relief Was Sought to Extend the Automatic Stay to Non-Debtors

36.    In recent years, cases of debtors with small to medium capitalization have had as a major portion of their indebtedness loans from Merchant Cash Advance ("MCA") companies.

37.    The MCA lenders seek to characterize their loans as purchases and sales of receivables, partially for the purpose of evading state usury restrictions and partially for the

purpose of arguing that MCA lenders are entitled to adequate protection for the use of cash collateral.

38.     Because of the doubt and ambiguity concerning the status and allowability of claims of these substantial creditors, the Debtor seeks to determine the nature, extent and validity of the liens and claims of MCA lenders. *See, e.g.*, the recent decisions in *In re Crosby Marine Transportation, LLC, et. al.*, 2026 WL 1781812, at *4 (Bankr. E.D. La. June 18, 2026) and *Greenwich Retail Grp. LLC v. Moby Capital, LLC (In re Greenwich Retail Grp. LLC)*, 677 B.R. 473 (Bankr. S.D.N.Y. 2026).

39.     The count relating to extension of the automatic stay to protect individuals seeks no immediate relief. The purpose of its insertion is to allow the Debtor to file separate motions seeking relief where appropriate. Injunctive relief requires an adversary proceeding. *See* Fed.R.Bankr.P. Rule 7001(g). Inclusion of the request in the adversary proceeding is consonant with judicial economy, since the verified complaint can be used as an affidavit. *See* Fed.R.Civ.P. Rule 65(b)(1)(A) as incorporated by Fed.R.Bankr.P. Rule 7065.

**VIII.    The United States Trustee's Statement That the Debtor "Has Not Responded" Is Inaccurate**

40.     Counsel for the Debtor and the UST conferred by Teams on July 22, 2026—the same day the Motion was filed. The Debtor's professionals have been in continuous communication with the UST since the Petition Date. The suggestion that the Debtor has stonewalled is simply untrue and undermines the credibility of the Motion.

<u>**CONCLUSION**</u>

**WHEREFORE**, the Debtor respectfully requests that the Court: (a) deny the Motion in its entirety; (b) deny the request for expedited determination to the extent it seeks to leapfrog the pending first-day motions; (c) authorize the Debtor to proceed with the pending motions and

11

engagement of CBIZ on terms to be agreed or ordered by the Court; and (d) grant such other and

further relief as is just and proper.

[*Remainder of Page Intentionally Blank*]

Dated: July 29, 2026
Boston, Massachusetts

Respectfully submitted,

MANNING GROSS + MASSENBURG LLP

*/s/David P. Primack*
David Primack (#569571)
125 High Street, Oliver Tower, 6th Floor
Boston, MA 02110
(302) 300-5277
dprimack@mgmlaw.com

*Proposed Counsel to the Debtor*

DAVIDOFF HUTCHER & CITRON LLP

*/s/ Robert L. Rattet*
Robert L. Rattet (*Pro Hac Vice*)
John D. Molino (*Pro Hac Vice*)
120 Bloomingdale Road, Suite 100
White Plains, NY 10605
(914) 381-7400

REMEDIUM PHARMACY LLC

*/s/ Flaviu Iepure*
Flaviu Iepure, President